**Case No. 22-3904**

---

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

KELSEY MERCER, AS ADMINISTRATOR OF THE ESTATE OF
JENNIFER OHLINGER, DECEASED

*Plaintiff-Appellant*,

v.

JAMES GRAY, II, RN, et al.

*Defendants-Appellees*.

On appeal from the United States District Court
For the Southern District of Ohio
District Court Case No. 2:20-cv-3214

---

## BRIEF OF DEFENDANTS-APPELLEES

---

Aaron M. Glasgow (0075466)
E-mail: aglasgow@isaacwiles.com
Mark Landes (0027227)
E-mail: mlandes@isaacwiles
ISAAC WILES & BURKHOLDER, LLC
Two Miranova Place, Suite 700
Columbus, Ohio 43215
(614) 221-2121 Phone
(614) 365-9516 Fax
*Attorneys for Defendants-Appellees*

## <u>DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST</u>

Pursuant to Sixth Cir. R. 26.1, Appellees make the following disclosure:

1.  Are said parties a subsidiary of a publicly owned corporation?  No.

2.  Is there a publicly owned corporation, not a party, to the appeal that has a financial interest in the outcome?  No.

Date:  January 5, 2023

/s/ *Aaron M. Glasgow*
Aaron M. Glasgow (0075466)
aglasgow@isaacwiles.com
Mark Landes (0027227)
ISAAC WILES & BURKHOLDER LLC
Two Miranova Place, Suite 700
Columbus, Ohio  43215
(614) 220-5170 Phone
(614) 365-9516 Fax
*Attorneys for Defendants-Appellees*

i

# **TABLE OF CONTENTS**

*Page*

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ........................................................................................... i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT IN SUPPORT OR ORAL ARGUMENT.........................1

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES ....................................................................1

STATEMENT OF THE CASE................................................................1

STATEMENT OF THE FACTS .............................................................3

A.     JUNE 20, 2108 – JUNE 24, 2018 .......................................3

B.     JUNE 25, 2018...................................................................4

ARGUMENT .......................................................................................111

A.     DELIBERATE INDIFFERENCE STANDARD. .....................................111

B.     RECENT DECISIONS APPLYING DELIBERATE INDIFFERENCE STANDARD. ........13

C.     CASES CITED BY APPELLANT ARE INAPPOSITE TO THIS CASE...........................17

D.     APPELLANTS ARE ENTITLED TO QUALIFIED IMMUNITY. ...................................19

E.     STATE LAW CLAIMS/WRONGFUL DEATH. .......................................30

CONCLUSION.....................................................................................355

CERTIFICATE OF COMPLIANCE....................................................366

CERTIFICATE OF SERVICE ..............................................................36

ADDENDUM ..........................................................................................................37

# TABLE OF AUTHORITIES

*Page*

## CASES

*Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011).....................................12

*Anderson v. City of Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266 ...............................................................................35

*Barr v. Freed*, 117 Ohio App. 3d 228.......................................................34

*Berry v. City of Detroit,* 25 F.3d 1342, 1353-1354 (6th Cir. 1994).........................24

*Bowels v. Bourbon Cty,* 6th Cir. No. 21-5012, 2021 U.S. App. LEXIS 21292 .................................................................................15

*Brawner v. Scott*, 14 F.4th 585 (6th Cir. 2021) ..................................... 11, 12, 32

*Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)...............................................................................31

*City of Tahlequah v. Bond*, 142 S. Ct. 9, 11, 211 L. Ed. 2d 170 (2021)..................31

*Clutters v. Sexton*, S.D. Ohio No. 1:02-cv-223, 2007 U.S. Dist. LEXIS 84025 .................................................................................20

*Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) ....................................13

*Cunningham v. Shelby County*, 994 F.3d 761, 764 (6th Cir. 2021) .......................32

*Darius Theriot #778606 v. Maclaren*, N.D. Mich. No. 2:18-CV-102, 2021 U.S. Dist. LEXIS 90848, 2021 WL 1904344......................................27

*Dominquez v. Corr. Med. Serv.,* 555 F.3d 543 (6th Cir. 2009) ....................... 18, 32

*Gates v. Leonbruno*, 8th Dist. No. 103738, 2016-Ohio-5627, 70 N.E.3d 1110 .................................................................................37

*Hearington v. Pandya,* 689 Fed. Appx. 422, 2017 WL 2080273, at *3 (6th Cir. 2017) .............................................................................13

*Hopper v. Plummer,* 887 F.3d 744, 759.................................................................37

*Johnson v. Karnes,* 398 F.3d 868 (6th Cir. 2005).......................................... 19, 20

*Kinglsey v. Hendrickson*, 576 U.S. 389 (2015) .....................................................11

*Marchetti v. Kalish*, 53 Ohio St.3d 95, 100, 559 N.E.2d 699 (1990).....................36

*Marcum v. Scioto County,* S.D. Ohio No. 1:10-cv-790, 2013 U.S. Dist. LEXIS 188503 ...................................................................................21

*McCain v. St. Clair County,* 750 Fed. Appx. 399 (6th Cir. 2018)..........................15

*McGaw v. Sevier Cty.*, 715 Fed. Appx. 495 (6th Cir. 2017) ........................... 27, 33

*O'Toole*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505 ..........................36

*Padula v. Trumbull County,* N.D. Ohio No. 4:10CV2876, 2012 U.S. Dist. LEXIS 111629 .................................................................................20

*Payne v. Hamilton Cty. Jail Sheriff's Staff*, No. 1:16-cv-426, 2016 U.S. Dist. LEXIS 153867, 2016 WL 6585579, at *3 (E.D. Tenn. Nov. 7, 2016)..............................................................................13

*Reece v. Shelby County*, E.D. Ky. No. 3:16-cv-00069-GFVT-EBA, 2021 U.S. Dist. LEXIS 50149 ......................................................................28

*Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7, 211 L. Ed. 2d 164 (2021)..............................................................................................31

*Schaad v. Buckeye Valley Local Sch. Dist. Bd. of Educ.,* 5th Dist. No. 15CAE0800063, 2016-Ohio-569................................................................35

*Stefan v. Olson*, 497 Fed. Appx. 568, 581 (6th Cir. 2012) ....................................37

*Trozzi v. Lake Cty.,* 29 F.4th 745 (6th Cir. 2022) ................................. 11, 12, 14, 32

*Trozzi v. Lake Cty.,* N.D. Ohio No. 1:20-cv-684, 2021 Ohio App. LEXIS 124903 ......................................................................... passim

## **STATUTES**

28 U.S.C. § 1291 .....................................................................................................1

28 U.S.C. § 1331 ........................................................................................................1

42 U.S.C. § 1983 ................................................................. 1, 2, 10, 11, 13, 30, 33

R.C. 2125.01 .........................................................................................................30

R.C. 2744.02 .........................................................................................................10

R.C. 2744.03(A)(6) ................................................................................ 10, 30, 33

R.C. 2744.03(A)(6)(b) ........................................................................................33

## STATEMENT IN SUPPORT OR ORAL ARGUMENT

Appellants request the opportunity to present oral argument to assist the Court in its consideration of the issues presented in this appeal.

## JURISDICTIONAL STATEMENT

Appellants appeal the District Court's Opinion and Order of September 22, 2022, which granted summary judgment to the Appellees. (Opinion and Order, RE 45, PageID # 1077) Federal court jurisdiction for this appeal is based upon 28 U.S.C. § 1331. Appellate jurisdiction is based upon 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     Whether the District Court correctly granted summary judgment to Appellees as to Appellant's claim under 42 U.S.C. § 1983, finding that Appellees Gray, Jarvis, and Lowery were not deliberately indifferent to a serious medical needs of decedent Jennifer Ohlinger.

2.     Whether the District Court correctly granted summary judgment to Appellees as to Appellant's state law tort claims, finding that Appellees Gray, Jarvis, and Lowery did not act recklessly with respect to the care and treatment of decedent Jennifer Ohlinger.

## STATEMENT OF THE CASE

Appellant Kelsey Mercer, acting as administrator for the Estate of Jennifer Ohlinger, a deceased person, filed a Complaint against Appellees. The Complaint named Athens Count, Ohio, Hocking County, Ohio, Morgan County, Ohio, Perry

County, Ohio, Vinton County, Ohio, James Gray, II, RN, Charity Lowery, Amista Jarvis, Cody Gilbreath and Joshua VanBibber. (RE 1, Complaint). The County Defendants were subsequently dismissed as parties at the request of the parties. (RE 22, Order). Appellants then filed an Amended Complaint on September 9, 2020. (RE 23, Amended Complaint). The Amended Complaint asserted claims for 1) violation of 42 U.S.C. § 1983; and 2) a wrongful death claim under state law. Id.

On September 30, 2021, Appellants and Officer Gilbraith and Warden VanBibber filed a Motion for Summary Judgment as to all claims asserted against them by Appellant. (RE 39, Motion for Summary Judgment). Appellant filed her responsive Memorandum in Opposition on October 21, 2021. (RE 42, Plaintiff's Memorandum in Opposition). At the same time, Appellant separately moved to dismiss the claims against Officer Gilbraith and Warden VanBibber. (RE 43, Motion to Drop Defendants). Appellant filed a Reply in support of Summary Judgment on November 4, 2021. (RE 44, Reply).

On September 22, 2022, the District Court filed an Opinion and Order granting summary judgment for the Appellees. (RE 45, Opinion and Order). The District Court also granted the Appellant's Motion to Dismiss Officer Gilbraith and Warden VanBibber. Id.

Appellant filed her Notice of Appeal of the District Court's Opinion and Order on October 20, 2022. (RE 47, Notice of Appeal).

## STATEMENT OF THE FACTS

**A.      June 20, 2108 – June 24, 2018**

On June 20, 2018 at 6:06 p.m., Ms. Ohlinger was booked into the Southeastern Ohio Regional Jail on charges of burglary and receiving stolen property, filing in the Athens County Court of Common Pleas. (RE 39-1, VanBibber Aff, PageID # 509). As part of the intake process, Ms. Ohlinger had a medical screening in which she was asked about the state of her health. (RE 36-5, Gray Depo. Ex. 6, PageID # 390). No medical conditions were indicated. Id. Ms. Ohlinger reported no physical signs of trauma or illness requiring immediate emergency treatment. (RE 36-5, Medical Questionnaire, PageID 390). The intake officer did not note anything remarkable or concerning about Ms. Ohlinger's physical condition. Id.

Ms. Ohlinger had a bond hearing the next day. Her bond was set at $25,000. (RE 39-1, VanBibber Aff., PageID # 513). She was transported to and personally attended the bond hearing at the Athens County Courthouse, all without incident. Id.

On June 24, 2018, Ms. Ohlinger had two interactions with family members, both of which were recorded.

The first was a phone call with her mother.  (RE 40, Surveillance Video). Ms. Ohlinger did not complain of any medical problems during that phone call. Id.

The second was a visit from her daughter, Plaintiff Kelsie Mercer. (RE 36-1, Mercer Depo., PageID # 207-209; RE 39-1, VanBibber Aff., Ex. A-3, PageID # 505). Ms. Ohlinger did not complain of any medical problems. Id. In fact, Ms. Mercer asked Ms. Ohlinger how she was feeling, and Ms. Ohlinger responded that "she was going good" and did not otherwise express any concerns or issue about her health. (RE 36-1, Mercer Depo., PageID # 208).  During both the call and visit, there is no indication that Ms. Ohlinger was in medical distress.

**B.    June 25, 2018.**

On June 25, 2018, Ms. Ohlinger collapsed and, ultimately, died. There is jail video showing Ms. Ohlinger and the jail staff's interaction with her in the hours leading up to her collapse.  (RE 40, Surveillance Video).

On that day, Nurse James Gray, the medical supervisor for the jail, was on duty. (RE 36-4, Gray Depo., PageID # 315).  So were Officers Lowery and Jarvis. (RE 36-2, Lowery Depo., PageID # 248; RE 36-6, Jarvis Depo., PageID # 431).

At 6:57 a.m., Ms. Ohlinger emerged from her cell (Cell No. 9) in SEORJ's "A-Block" for a clothes exchange. (RE 40, Surveillance Video, at 00:024). As she was walking by a table in the common area of the jail pod, Ms. Ohlinger apparently became disoriented and put her hand on the table to stabilize herself. Id.

She immediately sat down at the table.  Id. Ms. Ohlinger then fell off the bench at the table. Id. Other female inmates came to assist Ms. Ohlinger. Id. Other inmates called for help, and Officers Lowery and Jarvis responded. (Id.; RE 36-2, Lowery Depo., PageID # 251).  At that time, Ms. Ohlinger was moving around and was clearly conscious. Id. At 7:00 a.m., Ms. Ohlinger sat up on the floor. Id. At 7:02 a.m., Nurse Gray arrived, having been called in to assist by the officers. (Id., RE 36-4, Gray Depo., PageID # 315-16).

Over the next several minutes, Nurse Gray conducted an examination of Ms. Ohlinger.  Nurse Gray asked Ms. Ohlinger what happened, checked Ms. Ohlinger's vital signs, checked her eyes for pupil reaction, checked for facial symmetry and droop, checked for any motor skill deficits, and checked for slurred speech. (RE 36-4, Gray Depo., PageID # 318).  Nurse Gray also examines the left rear portion of Ms. Ohlinger's head. (RE 40, RE 40, Surveillance Video).  According to the notes taken from Nurse Gray, Ms. Ohlinger's oxygen level was 99%, pulse was 84, pupils were normal, alert, and oriented to time, place, and person, no swelling or laceration noted to Ms. Ohlinger's head. (RE 36-5, Gray Depo. Ex. 4, PageID # 388). Nurse Gray indicated that Ms. Ohlinger did not appear to be in a postictal, or post-seizure, state.  Id.  Taking together the information he gathered during his assessment, Nurse Gray determined that "[a]t that time there was no deficits, there was nothing acute going on with her that was—there was no objective information

transpiring that warranted any further action outside of monitoring." (RE 36-4, Gray Depo., PageID # 320).

Although inmates made the statement to the officers that Ms. Ohlinger had a seizure and hit her head, on his examination, Nurse Gray found no evidence for either statement. (RE 36-4, Gray Depo., PageID # 329). Specifically, there was no evidence of head trauma, such as lacerations or swelling, and there were no signs or symptoms that she was in a postictal state. (Re 36-4, Gray Depo., PageID # 330, 340). Based on the lack of any definitive evidence of an acute medical problem, Ms. Ohlinger was assisted back to her bed and advised to contact medical if any symptoms persisted or reappeared. (RE 36-4, Gray Depo., PageID # 340). Ms. Ohlinger was escorted back to her cell. (RE 40, Surveillance Video). She was steady on her feet and was talking to officers at that time. (RE 36-6, Jarvis Depo., PageID # 437). Officer Jarvis indicated that at that point, Ms. Ohlinger "seemed like she was fine when I was talking with her" and "[s]he seemed to me like having that conversation with her was not the type of conversation I typically have with somebody who just had a seizure..." (RE 36-6, Jarvis Depo., PageID # 434).

At 7:07 a.m., an inmate who had checked in on Ms. Ohlinger called for assistance. (RE 40, Surveillance Video; RE-36-2, Lowery Depo., PageID # 253). Officers Lowery and Jarvis responded and checked on Ohlinger. Id. The officers

6

escorted Ms. Ohlinger to change her clothes, as she had urinated on herself,[1] and then escorted her back to the medical area to see Nurse Gray. (RE 36-4, Gray Depo., PageID # 253-254; RE 36-6, Jarvis Depo., Page ID # 438). During that time, Ms. Ohlinger talked with Officer Lowery and was steady on her feet. (RE 36-2, Lowery Depo., PageID # 255).

From 7:16 a.m.– 7:39 a.m.— a period of 23 minutes--Ms. Ohlinger was examined by Nurse Gray. During that examination, he did a urine test to look for abnormalities. (RE 36-4, Gray Depo., PageID # 336). In his notes regarding that examination, Nurse Gray reported:

> Inmate into med room with report of seizure-like activity. Inmates report seizure in block. Inmate A/O (alert and oriented) x 3 spheres s/p (status post) seizure-like activity. Inmate denies hx (history) of seizures and denies medications. B/P (blood pressure) 120/70, pulse 92, Spot 99% ora (on room air), Temp 97.4. PEERLS (pupils equal and reactive to light stimuli. C/O (complained of) HA (headache) r/t (related to) report of hitting head on bench previously. Urine dark amber colored et (and) clear. U/A (urinalysis) strip +++ for blood, inmate is menstruating currently. All other components WNL (within normal limits). *States this has happened last jail she was in and they sent her to ED (emergency department). Dx (diagnosis) was dehydration. BS (blood glucose)* 186. No Hx (history) of diabetes. N/O (new order) CMP (complete metabolic panel), CBC (complete blood count) et Al C. Inmate A/0 (alert and oriented) without deficit. Stable without s/sx (signs or symptoms) of acute distress. Returned to A block.

Id.

---

[1] Officer Lowery indicated that an inmate urinating on themself and needed to change clothes was not unusual, happening sometimes on a daily basis. (RE 36-4, Gray Depo., PageID # 255).

A trace of glucose was found in Ms. Ohlinger's urine, prompting Nurse Gray to examine Ms. Ohlinger's blood sugar with a glucometer. (RE  36-4, Gray Depo., PageID # 322).   Ultimately, Nurse Gray determined that a "complete metabolic panel" was needed. (ECF 36-5, Medical Narrative, PageID # 390).  This required Nurse Gray order an outside laboratory to come draw Ms. Ohlinger's blood. (RE  36-4, Gray Depo., PageID # 323).  Under standing orders from the jail medical director, Nurse Gray was permitted to order this lab work. (RE  36-4, Gray Depo., PageID # 324). Ms. Ohlinger was sent back to her cell to await their arrival. (RE 40, Surveillance Video; RE 36-2, Lowery Depo., PageID # 256; RE 36-6, Jarvis Depo., PageID # 442).

At the 8:39 a.m. observation check, an officer walked by Ohlinger's cell and briefly looks in but did not go into the cell. (RE 40, Surveillance Video).  At 9:12 a.m., an inmate discovered Ms. Ohlinger unresponsive and called for help using the intercom. (Id.; RE 36-2, Lowery Depo., PageID # 257). At 9:14 a.m., corrections officers arrived. Id. Officer Lowery checked for a pulse on Ms. Ohlinger and finding none, she immediately radioed for medical to respond. (RE 36-2, Lowery Depo., PageID # 258, 263). At 9:15, Nurse Gray arrived and finding Ms. Ohlinger unconscious, he began an assessment, used the portable defibrillator to attempt to revive her, and began CPR. (RE 36-4, Gray depo., PageID # 325; RE 36-2, Lowery Depo., PageID # 263). A few minutes later, paramedics arrived and

took over medical care. (RE 40, Surveillance Video) Other jail staff, including warden and deputy warden, also arrived at the scene.  (RE 36-2, Lowery Depo., PageID # 263).  At 9:28 a.m., Ms. Ohlinger was transported to the hospital with paramedics. (RE 40, Surveillance Video).  Ms. Ohlinger later died at the hospital.

An autopsy was subsequently conducted. (RE 39-1, VanBibber Aff., Ex. A-4, PageID # 521-24).  The cause of death a subarachnoid hemorrhage and subdural hematoma of undetermined etiology. Id. The manner of death was classified as undetermined. Id. The autopsy indicated that there was no evidence of skull fracture or contusions. Id.

## SUMMARY OF THE ARGUMENT

The District Court below did not error in granting summary judgment to the Appellees.

Appellant cannot demonstrate that Nurse Gray was aware of facts sufficient to show that a reasonable person in his position would have understood that Ms. Ohlinger was in the midst of a medical emergency, or that he knew that a failure to respond regarding Ms. Ohlinger's condition would pose a serious risk to her and he ignored the risk despite his knowledge. In fact, Nurse Gray promptly provided Ms. Ohlinger with medical care and attempted to treat her based on the vague and inconsistent symptoms and facts about her condition about which he was aware. As determined by the District Court, Appellant's claim against Nurse Gray is for at

most medical negligence, which is not sufficient to support a Fourteenth Amendment claim under § 1983.

The District Court also correctly determined that Officer Lowery and Officer Jarvis were not deliberately indifferent to Ms. Ohlinger's medical needs. In fact, they quickly responded to Ms. Ohlinger when her medical issues were reported to them, they notified Nurse Gray about Ms. Ohlinger's condition, they followed all directives from Nurse Gray, and Officer Lowery escorted Ms. Ohlinger to and from the medical unit.

Finally, Appellant's state law claims for wrongful death are barred by immunity for individual employees of political subdivision under R.C. 2744.03(A)(6). For the same reasons that the Appellant cannot establish deliberate indifference, Appellant also cannot show that the individual Appellees acted recklessly—that is, with conscious disregard for a known risk of harm--which is the high threshold required to overcome individual immunity under R.C. 2744.03(A)(6).

**ARGUMENT**

**A.    Deliberate Indifference standard.**

The District Court observed in its Decision that the standard for Fourteenth Amendment claims of pre-trial detainees under § 1983 has recently been subject to modification, starting with the decision in *Brawner v. Scott*, 14 F.4th 585 (6th Cir. 2021), decided in light of the Supreme Court's decision in *Kinglsey v. Hendrickson*, 576 U.S. 389 (2015).

Most recently, this Court clarified *Brawner* in *Trozzi v. Lake Cty.,* 29 F.4th 745 (6th Cir. 2022) in a lengthy discussion of the current state of the deliberate indifference standard. This Court held that to properly analyze a deliberate indifference claim under the Fourteenth Amendment post-*Brawner*, courts must still consider an official's actual knowledge of the relevant circumstances of the detainee.  Id. at 755.  With that in mind, this Court directed that a plaintiff must satisfy three elements to prevail on any inadequate medical-care claim arising under the Fourteenth Amendment, which are: (1) that the plaintiff has an objectively serious medical need; (2) that a reasonable officer at the scene (knowing what the particular jail official knew at the time of the incident) would have understood that the detainee's medical needs subjected the detainee to an excessive risk of harm; and (3) that the prison official knew that his failure to

respond would pose a serious risk to the pretrial detainee and ignored that risk.  *Id.* at 757-58.

Notably, the decisions in *Brawner* and *Trozzi* confirmed that a showing of negligence is not sufficient to establish a deliberate indifference claim—in fact "[f]ar more is required to establish a constitutional violation." *Trozzi*, 29 F.4th at 759; *Brawner*, 14 F.4th at 596. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011).  Moreover, even if a plaintiff could demonstrate that a defendant's treatment amounted to medical malpractice, such malpractice does not rise to the level of a constitutional violation.  *Hearington v. Pandya,* 689 Fed. Appx. 422, 2017 WL 2080273, at *3 (6th Cir. 2017) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Payne v. Hamilton Cty. Jail Sheriff's Staff*, No. 1:16-cv-426, 2016 U.S. Dist. LEXIS 153867, 2016 WL 6585579, at *3 (E.D. Tenn. Nov. 7, 2016). "[W]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

**B.      Recent Decisions applying Deliberate Indifference Standard.**

This Court has decided multiple cases within the past few years similar this one.  These decisions highlight the important difference between negligence and deliberate indifference under § 1983.

In *Trozzi v. Lake Cty.,* N.D. Ohio No. 1:20-cv-684, 2021 Ohio App. LEXIS 124903, plaintiff alleged that corrections officer and a jail nurse ignored her complaints about abdominal pain which were ultimately diagnosed as a liver abscess and perforated ulcer, necessitating emergency surgery.  The evidence established that the defendant nurse had prescribed the inmate antacids and directed that she be placed on regular observation.  When she examined the inmate, the nurse also noted her vital signs were stable (so she did not call for an ambulance).  Given the affirmative steps that the nurse took to address the inmate's condition, the plaintiff could not establish deliberate indifference. (Id. at *18). The District Court held that even if, in hindsight, the nurse should have called an ambulance for the plaintiff, "her decision not to do so may have been negligent, at most, but it does not amount to deliberate indifference." Id.   This Court subsequently affirmed that decision, finding that the jail nurse was entitled to qualified immunity. *Trozzi,* 29 F.4th at 762.

In *Bowels v. Bourbon Cty,* 6th Cir. No. 21-5012, 2021 U.S. App. LEXIS 21292, an inmate was held at the defendant jail for 12 days.  During that time, the

inmate repeatedly requested medical help for headache, neck pain, sinus pressure, nausea, and vomiting. The inmate was examined several times by medical staff, who believed he had a sinus infection and provided him with medication accordingly. When the inmate's condition deteriorated, he was taken to the hospital, where it was determined that he had a brain tumor. The inmate died at the hospital. Plaintiff argued that the jail medical staff was deliberately indifferent to his medical needs, based on his documented symptoms over the course of almost two weeks. Analyzing the facts related to each defendant, in each case, there was evidence that the staff members saw the inmate and provided treatment that they deemed appropriate, given his symptoms. This Court found no evidence that the defendants ignored the inmate's medical needs, or that the facts showed anything more than negligence on the part of those defendants. Id. at *31.

In *McCain v. St. Clair County,* 750 Fed. Appx. 399 (6th Cir. 2018), plaintiff inmate sued the medical staff at the jail where he was held for deliberate indifference to his medical needs. The inmate, who took medications for a seizure disorder, had a seizure while in custody. The on-duty nurse who responded did not take the plaintiff's vitals or call a doctor, though she noted that he had "frothy lips with [a] hint of blood." He stopped seizing and was "arousable after about seven minutes" from the nurse's arrival," and he was able to move on his own, open eyes and understand his surroundings. The nurse directed that he be monitored every 30

minutes in his cell.  She also ordered plaintiff's anti-seizure medication.  Before it arrived however, he had another seizure and was hospitalized and was diagnosed with a subarachnoid bleed in his brain.  The plaintiff argued that the responding nurse was deliberately indifferent to the plaintiff after the first seizure because she did not call a doctor to check on him or take his vital signs.  This Court, however, noted that the nurse took other measures to abate the risk to the plaintiff, including checking his status and confirming his ability to move, open his eyes and understanding his surroundings.  She also placed him on a 30-minute watch.  Plaintiff's argument that she should have done more than this were merely arguments that she was negligent, not deliberately indifferent.  Accordingly, this Court affirming summary judgment for the nurse.

In *Griffith v. Franklin County,* 975 F.3d 554, (6th Cir. 2020), plaintiff inmate was arrested in connection with an attempted robbery, during which he was struck in head with a baseball bat.  He was nauseated and intermittently vomiting at the time of his arrest and intake into the jail.  He was initially screened by a jail nurse, and then screened later by another nurse the next day.  Because he was continuing to vomit and experience nausea, a nurse did a urine dip test, which revealed abnormal levels of blood and urine.  As a result, the nurse placed the inmate on a list to be seen by the advanced practice registered nurse the next week.  The nurse also prescribed an antibiotic.  He was eventually transferred from a

detox cell to general population.  For the next several days, he continued to remain ill and was "vomiting constantly in his cell." (Id. 564). Eventually, the inmate had a seizure while on the top bunk of cell, causing him to strike his head on the wall and bunk. Id. Although he was purple in the face and breathing erratically, he stabilized while waiting for the nurse.  The nurse observed no signs of a head injury and the inmate denied pain. Id.  He was given fluids and an anti-nausea drug and returned to his cell. The nurse did not notify the jail doctor about the seizure. Several hours later, he had another seizure, and this time, the nurse observed that he had blue skin, erratic breathing, dilated pupils, and disorientation. Id.  He was sent to the local emergency room, where he was diagnosed with renal failure. Plaintiff sued the jail and medical staff who had treated him, alleging that they were deliberately indifferent to his medical needs, including failing to summon a doctor or take him to the hospital after his first seizure.  The inmate also argued that one of the responding nurses failed to follow the jail's internal policies by failing to initiate a detox protocol and by giving him over the counter medication without approved from the jail doctor.  Id. at 578.

Affirming summary judgment, the Court held that following his first seizure, the responding nurse "responded to all of [the inmate's] complaints, attempted to treat his condition, and performed tests to identify its cause." Id. at 578.  Thus, the Court found that even if the nurse's assessment and treatment of the

inmate might not represent "the best of medical practices," those actions did not suggest deliberate indifference. Id. This Court also discounted the alleged violation of the jail's policies, holding that "the failure to following internal policies, without more, [does not] constitute deliberate indifference." Id.

## C.     Cases cited by Appellant are inapposite to this case.

In her Brief, Appellant compares this case to several older deliberate indifference cases.  These case are distinguishable from this case and do not support Appellant's appeal.

For instance, Appellant relies heavily on *Dominquez v. Corr. Med. Serv.,* 555 F.3d 543 (6th Cir. 2009).  In *Dominquez,* this Court affirmed the District Court's denial of summary judgment to a jail nurse on a deliberate indifference claim.  An inmate suffered from untreated heat stroke while at the jail.  The evidence established that the jail nurse was aware of the inmate's condition and the attendant complications if not timely treated.  Despite this knowledge, the nurse (1) delayed seeing the inmate for 3.5 hours until her normal rounds; (2) returned the inmate to his unairconditioned cell during hot weather; and (3) when told the inmate was unconscious, she delayed providing treatment for 25 minutes. Id. at 551.  Thus, unlike in this case, the nurse knew the nature of the inmate's condition and the possible consequences if not treated but failed to take any action and

delayed treatment.  Notably, in *Trozzi*, which is much closer factually to this case, this Court distinguished *Dominquez* based on the same facts.

Appellant also mistakenly relies on *Johnson v. Karnes,* 398 F.3d 868 (6th Cir. 2005).   In *Johnson*, when the plaintiff inmate was booked into the jail, jail staff were provided with medical records stating that the inmate had severed tendons in his hand that needed immediate surgery. Id. at 871. The plaintiff also sent multiple medical requests clearly describing the injury. Id.  Despite this, the jail doctor delayed a necessary surgery for the condition for a month, causing the injury to become permanent.  This Court affirmed the denial of summary judgment to the jail doctor, finding that there was evidence that jail doctor knew about the tendon injury and need for the surgery.  Id. at 876.  The decision in *Johnson* turned on the fact that there was concrete evidence that the defendant was aware of the inmate's condition and the consequences of delay, and yet failed to act.  This is not the case here.

Appellant also mistakenly relies on a series of District Court decisions in deliberate indifference cases which are inapposite to this case.  In each case, there was evidence that the defendant nurse or doctor was actually aware of the inmate's medical condition and the consequences if the condition was not treated, and yet delayed or failed to provide treatment.  See *Padula v. Trumbull County,* N.D. Ohio No. 4:10CV2876, 2012 U.S. Dist. LEXIS 111629 (Allegation that medical

assistant failed to provide treatment to an inmate she knew to be suffering from delirium tremens was sufficient to state a claim for deliberate indifference); *Clutters v. Sexton*, S.D. Ohio No. 1:02-cv-223, 2007 U.S. Dist. LEXIS 84025 (Summary judgment denied based on evidence that jail failed to provide prescription medication to inmate known to be in withdrawal); and *Marcum v. Scioto County,* S.D. Ohio No. 1:10-cv-790, 2013 U.S.  Dist. LEXIS 188503 (Summary judgment denied for doctor who failed to examine inmate despite knowledge of his asthma condition and need for medication).   These cases are not applicable here, as there is no evidence that the Defendants were aware (or should reasonably have been aware) of the serious nature of Ms. Ohlinger's condition *or* that they failed to take action to address her condition based on the incomplete information that they did have about her condition.

**D.    Appellants are entitled to qualified immunity.**

Appellees are entitled to qualified immunity as a matter of law.  As the first prong of the analysis for qualified immunity, the District Court correctly determined that the evidence did not establish that any of the Appellees violated Ms. Ohlinger's right to medical care as a matter of law.  In addition, though the District Court did not reach the issue, the Appellees would also be entitled to qualified immunity because the law regarding the lawfulness of their conduct was

not clearly established as of June 25, 2018. Each of these prongs is addressed separately below.

**1.    The District Court correctly found that the Appellees' conduct did not violate of Ms. Ohlinger's constitutional rights.**

For the purposes of this appeal, Appellees will concede that Ms. Ohlinger has an objectively serious medical need in the form of an undiagnosed brain hemorrhage. The District Court correctly determined that Appellant could not meet the third prong of the *Trozzi* standard for any of the Appellees. In addition, though the District Court did not analyze the second prong, there is also no evidence to meet this prong for any of the Appellees.

**a.    Nurse Gray.**

The District Court focused on the third prong under *Trozzi*—looking at whether Nurse Gray knew that that his failure to respond to Ms. Ohlinger's condition would pose a serious risk to the pretrial detainee and *ignored that risk*. In fact, there is no evidence that Nurse Gray disregarded or ignored Ms. Ohlinger's condition. The opposite is true. As the Court noted, in response to the information he received, Nurse Gray attempted to root out the cause of Ms. Ohlinger's symptoms. After she fell and he was called to see her, he listened to her and to the other inmates about what had occurred. He examined her to determine if there was any evidence of a head injury. He examined her to determine whether there was any evidence that she had experienced a seizure. When she was brought to him

20

again, he conducted a further examination of her for nearly 30 minutes, as described above. He discussed her condition with her. He ordered additional testing to determine if there were any underlying issues. He gave her over-the-counter medication that he thought would help her. He gave her fluids to help with the one condition—dehydration—to which Ms. Ohlinger herself tied the symptoms she was experiencing. Appellant argues that in hindsight, Nurse Gray should have read from her symptoms that she had a serious medical need and taken additional or different actions than he did. But the fact that Nurse Gray perceived a lesser risk of harm than was actually present and acted on that belief, while perhaps evidence of negligence, is not deliberate indifference. And there is no question that Nurse Gray did, in fact, taken action with respect to Ms. Ohlinger's condition. Moreover, there is no evidence that as a result of his assessment, Nurse Gray understood that failing to act other than he did posed a serious risk to Ms. Ohlinger.

The appropriateness of the actions taken by Nurse Gray in addressing Ms. Ohlinger's medical condition and the medical care she was provided were assessed by Dr. Thomas Fowlkes, who is Board Certified in both Emergency Medicine and Addiction Medicine and has more than 20 years of practice in Correctional Medicine. (RE 39-3, Expert Report of Thomas D. Fowlkes, PageID # 1008-1036). According to Dr. Fowlkes, Nurse Gray's actions related to the assessment and

treatment of Ms. Ohlinger were appropriate and within the acceptable standard of care for a jail nurse. (RE 39-3, Fowlkes Report, PageID # 1018).

As the District Court discussed in the Opinion and Order, Appellant argues that summary judgment based primarily because (1) the nature of Ms. Ohlinger's medical need; (2) SEORJ's nursing guidelines; and (3) the opinion of their medical expert. As to the first two items, the District Court accurately observed this evidence arguably supports only that Nurse Gray was negligent in either not recognizing Ms. Ohlinger's needs or in not appreciating that more was needed to address those needs. These failings, even if proven, do not establish that Nurse Gray was deliberately indifferent to Ms. Ohlinger. The District Court also properly disregarding the opinion of Appellant's expert witness, which express nothing more than his bare legal conclusion that Appellees were deliberately indifferent. This is not evidence for the purposes of overcoming summary judgment under Fed. R. Civ. P. 56(c). See *Berry v. City of Detroit,* 25 F.3d 1342, 1353-1354 (6th Cir. 1994).

Based on the record in this case, the District Court was correct in finding that the evidence "does not meaningfully show that Nurse Gray 'actually understood' (and ultimately disregarded) the 'consequences' of failing to rush Ms. Ohlinger to the hospital," which is the gravamen of the third prong under *Trozzi* as a matter of law. (ECF 45, Opinion and Order, PageID 1089)

In addition, although the District Court did not need to reach the issue, there is also no evidence to support the second prong under *Trozzi*—that a reasonable person in Nurse Gray's position (knowing what he did) would have drawn the conclusion that there was an excessive risk of harm to Ms. Ohlinger if he did not immediately arrange her transport to the hospital. The crux of the Appellant's argument is that Nurse Gray should have known that Ms. Ohlinger was in the midst of a medical emergency because he has been told that she hit her head, that he had been told by other inmates that she had experienced seizures, and the fact that she urinated on herself. There are several problems with this argument.

The objective, physical evidence gathered by Nurse Gray was inconsistent with what he was told by other inmates—that Ms. Ohlinger suffered a head injury and/or was experiencing seizures. As to the potential head injury, Nurse Gray conducted a neurological assessment when Ms. Ohlinger first fell down, which included a series of steps to objectively test her neurological functioning. He found no signs of neurological impairment. (RE 36-4, Gray Depo., PageID # 330). He also found no contusions or lacerations on her head, or other evidence of any kind of head trauma. (RE 36-4, Gray Depo., PageID # 329). Thus, although other inmates reported that Ms. Ohlinger hit her head, Nurse Gray found no objective evidence that that Ms. Ohlinger suffered a head injury.

23

As to whether or not Ms. Ohlinger had a seizure, Nurse Gray also looked for and found no signs that Ms. Ohlinger was in a postictal state after the reported seizures—a state which is characterized by drowsiness, confusion, nausea, or other signs of disorientation.  (RE 36-4, Gray Depo., PageID # 330).   When Ms. Ohlinger was brought to the medical unit, Nurse Gray conducted a more in-depth physical examination, including a urine test, to determine if there was any underlying issue going on with her.  (RE 36-5, Gray Depo. Ex. 3, PageID 387). Other than a slightly elevated blood sugar, he found no evidence of any problem. Id.  Appellant also points to the fact that Ms. Ohlinger urinated on herself as evidence of a medical emergency.  However, this is not an infrequent occurrence in the jail and not itself indicative of a medical emergency.  (RE 36-2, Lowery Depo., PageID # 255). In addition, up to the point that Ms. Ohlinger was found unresponsive, she was able to communicate with the Appellees and did not request medical assistance (no kites, no requests to see the nurse).  Thus, as with the head injury, while there was some information from other inmates who subjectively described Ms. Ohlinger as having a seizure, Nurse Gray looked for but found little objective, physical evidence that Ms. Ohlinger actually had a seizure.  Thus, there was not sufficient evidence for a reasonable person in Nurse Gray's position to glean from the vague and conflicting information that she was having seizures--or

that she was in the midst of a medical emergency.  Thus, Appellant's claim against Nurse Gray also fails on the second prong under *Trozzi.*

### b.    Officers Lowery and Jarvis.

This Court has held that "a non-medically trained officer does not act with deliberate indifference to an inmate's medical needs when he "reasonably deferred to the medical professionals' opinions." *McGaw v. Sevier Cty.*, 715 Fed. Appx. 495 (6th Cir. 2017).  Where an officer responds to a substantial risk of serious harm by asking for and following the advice of a professional the officer believes to be capable of assessing and addressing that risk, then the officer commits no act of deliberate indifference in adhering to that advice.  *Trozzi v. Lake Cty.*, N.D. Ohio Case No. 1:20-cv-00684, 2021 U.S. Dist. LEXIS 124903; *Darius Theriot #778606 v. Maclaren*, N.D. Mich. No. 2:18-CV-102, 2021 U.S. Dist. LEXIS 90848, 2021 WL 1904344; *Reece v. Shelby County*, E.D. Ky. No. 3:16-cv-00069-GFVT-EBA, 2021 U.S. Dist. LEXIS 50149.  ("[T]he onus is on medical personnel to make decisions as to what medical care is required, not the non-medical officers").

In this case, Officers Lowery and Jarvis relied on the medical judgment and advice of Nurse Gray with regard to the treatment of Ms. Ohlinger.

After Ms. Ohlinger initially fell, Officer Lowery responded, cushioned her head with a sweatshirt, and called Nurse Gray for help. (RE 36-2, Lowery Depo., PageID # 250).  She provided all the information she had about Ms. Ohlinger to

Nurse Gray.  (RE 36-2. Lowery Depo., PageID # 251). Nurse Gray then conducted his examination of Ms. Ohlinger and then released her to go back to her cell. Id. Her next interaction with Ms. Ohlinger was when other inmates called for help a few minutes later.  (RE 36-2. Lowery Depo., PageID # 252).  Officer Lowery then took Ms. Ohlinger to the medical unit to see Nurse Gray. (RE 36-2. Lowery Depo., PageID # 253-54).  She then left while Ms. Ohlinger was being treated by Nurse Gray, and then returned when she was ready to go back to her cell. (RE 36-2. Lowery Depo., PageID # 254).  Officer Lowery then walked Ms. Ohlinger back to her cell. (RE 36-2. Lowery Depo., PageID # 257).  Her next "interaction" with Ms. Ohlinger was when she was called to Ms. Ohlinger's cell when she was found unresponsive. Id.

Officer Jarvis responded to the initial call about Ms. Ohlinger with Officer Lowery. (RE 36-6, Jarvis Depo., PageID # 434).  She was present before and while Nurse Gray examined Ms. Ohlinger. (RE 36-6, Jarvis Depo., PageID # 436). During this time, she indicated that Ms. Ohlinger seemed fine.  (RE 36-6, Jarvis Depo., PageID # 437).  After being examined by Nurse Gray, Officer Jarvis, and Officer Lowery escorted Ms. Ohlinger back to her cell when Nurse Gray was finished examining Ms. Ohlinger. Id. Ms. Ohlinger walked to her cell on her own power. Id. A little while later, Officer Jarvis was called back to Ms. Ohlinger's cell, based on a call from other inmates.  (RE 36-6, Jarvis Depo., PageID # 438).

Officer Jarvis and Officer Lowery took Ms. Ohlinger to the medical unit to see Nurse Gray, who performed another examination. (RE 36-6, Jarvis Depo., p. 20). After Nurse Gray completed his examination, Officer Jarvis and Officer Lowery took Ms. Ohlinger to change her clothes and then escorted her back to her cell. (RE 36-6, Jarvis Depo., PageID # 439). Officer Jarvis left for the day and had no further contract with Ms. Ohlinger. (RE 36-6, Jarvis Depo., PageID # 434).

Dr. Fowlkes also reviewed the conduct of Officer Lowery and Officer Jarvis. He indicated that the appropriate response by a trained correctional officer when presented with medical issues by an inmate where a nurse is on-duty is to facilitate evaluation by the nurse. (RE 39-3, Fowlkes Report, PageID # 1017). He found that this is what both Officer Lowery and Officer Jarvis did in this case. (RE 39-3, Fowlkes Report, PageID # 1017-1018).

Both Officer Lowery and Officer Jarvis acted appropriately. Both officers responded quickly when called about Ms. Ohlinger's condition. Both officers facilitated Nurse Gray's evaluation of Ms. Ohlinger. Both officers followed the professional judgment of Nurse Gray regarding the medical care for Ms. Ohlinger. There was nothing about Ms. Ohlinger's condition that would have suggested that they should second-guess Nurse Gray's professional judgment about Ms. Ohlinger's treatment. As non-medical officers, they did exactly what was required of them, which was to get her to medical staff, quickly. As such, there is no

evidence that they were deliberately indifferent to Ms. Ohlinger's medical needs.

Accordingly, Officers Lowery and Jarvis are entitled to qualified immunity, as

Plaintiff cannot establish that they violated Ms. Ohlinger's constitutional rights.

### 2. Appellees are entitled to qualified immunity, as the law in 2018 would not put them on notice beyond fair debate that their conduct violated Ms. Ohlinger's constitutional rights.

Even if this Court were to find a constitutional violation with respect to the

Appellees' conduct, they would still be entitled to qualified immunity because they

did not violate clearly established law.

Qualified immunity is appropriate unless the officer in question had "fair

notice" that her conduct was unlawful. *Brosseau v. Haugen*, 543 U.S. 194, 198,

125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (per curiam). To provide such notice, the

scope of the constitutional right must be "sufficiently clear that every reasonable

official would have understood that what [she] is doing violates that right." *Rivas-*

*Villegas v. Cortesluna*, 142 S. Ct. 4, 7, 211 L. Ed. 2d 164 (2021) (per curiam).

Whether the official had such notice is "judged against the backdrop of the law at

the time of the conduct." *Brosseau*, 543 U.S. at 198. Critically, "clearly established

law" is not defined at a "high…level of generality." *City of Tahlequah v. Bond*,

142 S. Ct. 9, 11, 211 L. Ed. 2d 170 (2021). While a case need not be "directly on

point for a right to be clearly established," the burden is on the plaintiff to show

that closely analogous precedent has placed the "constitutional question beyond debate." *Cunningham v. Shelby County*, 994 F.3d 761, 764 (6th Cir. 2021).

In *Trozzi,* this Court specifically addressed the status of the law regarding deliberate indifference as it existed in April, 2018. This Court found that the law at that time was not sufficiently clear to put the jail nurse on notice that her chosen course of treatment for the inmate violated the Constitution. That course of treatment included examining the inmate and taking her vital signs, putting her on a monitoring schedule, prescribing her medication, and scheduling her for an appointment with the jail doctor. This Court held that the facts in *Dominguez* did not provide notice to the jail nurse that her conduct violated the inmate's constitutional rights. *Trozzi,* 29 F.4th at 762.

The events in the case occurred roughly two months after the events at issue in *Trozzi*, all of which pre-dates the *Brawner* decision. The relevant state of the law for this case is the same as it was in *Trozzi.* For the same reasons stated in *Trozzi,* the law was not clearly established such that the Appellees in this case would have known that their conduct violated Ms. Ohlinger's constitutional rights. Under the particularized facts of this case—where a jail nurse is faced with vague symptoms by the inmate and conflicting information between the subjective observations from other inmates and the objective medical facts observed by the nurse himself—there is no case law that would put the unconstitutionality of Appellees'

29

conduct "beyond debate" or would tell every official that the action violated the Constitution. Consequently, Nurse Gray is entitled to qualified immunity.

As set forth above, this Court has held that corrections officers do not violate an inmate's constitutional when they respond to a substantial risk of serious harm by asking for and following the advice of a professional the officer believes to be capable of assessing and addressing that risk, and then adhering to that advice. *McGaw*, 715 F. App'x at 99. The facts are that these officers responded quickly and appropriately when alerted to Ms. Ohlinger's medical needs, they brought her to medical staff immediately, and they followed the advice given by medical advice. There is no case law in effect in 2018 that placed the alleged unconstitutionality of these officer's conduct "beyond debate" or would tell the officers that their actions violated the Constitution. Consequently, Officers Lowery and Officer Jarvis are entitled to qualified immunity.

**E.    State Law Claims/Wrongful Death.**

In addition to the federal claims under § 1983, Appellant also asserted state law claims against Appellees for wrongful death under R.C. 2125.01. The District Court did not err in granting summary judgment as to these claims, finding that the Appellees are immune from those claims under R.C. 2744.03(A)(6)

Appellant's wrongful death claims are tort claims against employees of a political subdivision for conduct which is undisputedly within the scope of their

employment with SEORJ, i.e. supervision of inmates at a jail. As a result, the Appellees are immune from those claims under R.C. 2744.03(A)(6) unless one of the exceptions to that immunity applies.

R.C. 2744.03(A)(6) provides that an employee of a political subdivision is immune from liability from tort claims unless the acts for which the employee has been sued were (1) manifestly outside the scope of their employment; (2) were malicious, in bad faith, or wanton or reckless, or (3) where civil liability is expressly imposed on the employee by another section of the Revised Code.

In this context, "malice" means "indulging or exercising malice; harboring ill will or enmity" or the "willful or intentional design to do injury." *Barr v. Freed*, 117 Ohio App. 3d 228, "Bad faith" has been defined as a "dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud." *Schaad v. Buckeye Valley Local Sch. Dist. Bd. of Educ.,* 5th Dist. No. 15CAE0800063, 2016-Ohio-569, at ¶ 24. There is no evidence that any of the Appellees engaged in conduct that was consciously intended to cause harm or was characterized by ill-will or dishonesty.

"Wanton misconduct" is "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability

that harm will result." *Anderson v. City of Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 33.

"Reckless conduct" is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson* at ¶ 34. "The actor must be conscious that his conduct will in all probability result in injury." *O'Toole*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, at paragraph three of the syllabus. In other words, there must be "'a perverse disregard of a known risk.'" Id.

With respect to the difference between negligence and recklessness, the Ohio Supreme Court has cited "with approval" the following from the Second Restatement of Torts:

> Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this

difference of degree is so marked as to amount substantially to a difference in kind.

*Marchetti v. Kalish*, 53 Ohio St.3d 95, 100, 559 N.E.2d 699 (1990), fn. 3.

The standard for establishing wanton or reckless conduct is "high" and requires consideration of the "totality of the circumstances." See, *Gates v. Leonbruno*, 8th Dist. No. 103738, 2016-Ohio-5627, 70 N.E.3d 1110, at ¶ 39. As such, the determination of whether an employee acted in a wanton or reckless manner is highly dependent on the facts of each case.

The "conscious disregard" standard under R.C. 2744.03(A)(6)(b) is effectively the same high standard as the "deliberate indifference" standard under Section 1983. See, *Hopper v. Plummer,* 887 F.3d 744, 759 ("When federal qualified immunity and Ohio state-law immunity under § 2744.03(A)(6) rest on the same questions of material fact, we may review the state-law immunity defense "through the lens of the federal qualified immunity analysis."). In fact, the Sixth Circuit has observed that the state law threshold for liability is "slightly higher under Ohio law." *Stefan v. Olson*, 497 Fed. Appx. 568, 581 (6th Cir. 2012).

In its Opinion and Order, the District Court found that Appellant could not meet the high standard for liability under R.C. 2744.03(A)(6)(b) for the same reasons that she could not establish "deliberate indifference" under federal law. While Appellant may believe that Nurse Gray *should* have perceived that Ms. Ohlinger was in the midst of a medical emergency, there is no evidence that he *did*

33

perceive this fact and consciously disregarded it. To the contrary, he tried to determine the underlying basis for the moderate and common-place symptoms that were presented to him, and he took steps to address what he believed to be the underlying issues causing those symptoms. Reasonable minds might disagree about whether he was negligent in not correctly assessing Ms. Ohlinger's medical situation and needs, but there is no evidence for reasonable minds to find that he correctly apprehended that she had a serious medical need and then disregarded the danger posed to her.

There is also no evidence that any of the Officers Lowery or Jarvis consciously disregarded a known risk of harm to Ms. Ohlinger. As noted above, it was not clear to Nurse Gray that Ms. Ohlinger was having a serious medical issue that posed a substantial risk to her health. As non-medical employees, it would be an even greater stretch to find that Officers Lowery and Jarvis knew of a risk of harm to Ms. Ohlinger. Moreover, the evidence establishes that Officers Lowery and Jarvis did *not* disregard Ms. Ohlinger. When they were contacted about her, they immediately took reasonable steps to summon medical help for Ms. Ohlinger and took her to the medical unit. This is the opposite of disregarding a risk.

Because there is no evidence that Appellees acted wantonly or recklessly with respect to Ms. Ohlinger, the District Court correctly determined that they are entitled to immunity from Appellant's state law wrongful death claims.

## <u>CONCLUSION</u>

For the reasons set forth herein, Appellees James Gray, II, Charity Lowery, and Amista Jarvis respectfully request that this Court affirm the Opinion and Order of the District Court (ECF 45) granting summary judgment in their favor as to all claims asserted by Appellant.

Respectfully submitted,

/s/ *Aaron M. Glasgow*
Aaron M. Glasgow (0075466)
E-mail: aglasgow@isaacwiles.com
ISAAC WILES & BURKHOLDER LLC
Two Miranova Place, Suite 700
Columbus, Ohio 43215
(614) 221-2121 Phone
(614) 365-9516 Fax
*Attorneys for Defendant-Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Sixth Cir. R. 32(a), the undersigned counsel certifies that:

1.    This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010, in Times New Roman 14-point font.

2.    Counsel also certifies that the word count utility associated with Microsoft Word 2010 returned a report that **9,357 words**, **977 lines** appear herein.

/s/ *Aaron M. Glasgow*
Aaron M. Glasgow (0075466)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 5, 2023, a copy of the foregoing *Brief of Appellees* was filed in the U.S. Court of Appeals for the Sixth Circuit. Notice of this filing will be sent to all parties registered with the Court by operation of the Court's electronic filing system.

/s/ *Aaron M. Glasgow*
Aaron M. Glasgow      (0075466)

**ADDENDUM**

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

| Description of Entry | Date | Page I.D. Number Range | Record Entry No. |
|---|---|---|---|
| Complaint | 06/25/20 | | 1 |
| Order | 09/08/20 | | 22 |
| Amended Complaint | 09/09/20 | | 23 |
| Mercer Deposition | 09/29/21 | 207-209 | 36-1 |
| Lowery Deposition | | 248, 251, 253, 254, 255, 256, 257, 258, 263, | 36-2 |
| Gray Deposition | 09/29/21 | 315-316, 318, 322, 323, 324, 325, 329-330, 336, 340 | 36-4 |
| Gray Deposition Exhibits | 09/29/21 | 388, 390 | 36-5 |
| Jarvis Deposition | | 431, 434, 437, 438, 442 | 36-6 |
| Motion for Summary Judgment | 09/30/21 | | 39 |
| VanBibber Affidavit, Exhibit A-3 & A-7 | 09/30/21 | 509, 513 | 39-1 |
| Surveillance Video | 09/29/21 | | 40 |
| Plaintiff's Memorandum in Opposition | 10/21/21 | | 42 |
| Motion to Drop Defendants | 10/22/21 | | 43 |
| Reply in Support of Summary Judgment | 11/04/21 | | 44 |
| Opinion and Order | 09/22/22 | 1077 | 45 |
| Notice of Appeal | 10/20/22 | | 47 |